**James R. RAIMONDI, Petitioner**

v.

**UNEMPLOYMENT COMPENSATION BOARD OF REVIEW,**
**Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Oct. 8, 2004.
Decided Dec. 22, 2004.

William C. Price, Jr., Pittsburgh, for petitioner.

Joseph F. Quinn, Pittsburgh, for respondent.

BEFORE: FRIEDMAN, Judge, and SIMPSON, Judge, and McCLOSKEY, Senior Judge.

OPINION BY Judge FRIEDMAN.

James R. Raimondi (Claimant) petitions for review of the June 8, 2004, order of the Unemployment Compensation Board of Review (UCBR) denying Claimant benefits pursuant to section 402(e) of the Pennsylvania Unemployment Compensation Law (Law).[1] We affirm.

Claimant worked as a meter reader for Equitable Gas Company (Employer) from October 30, 2000, to December 5, 2003. The terms and conditions of Claimant's employment were governed by a collective

---

1. Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended*, 43 P.S. § 802(e). Section 402(e) of the Law states that an employee shall be ineligible for compensation for any week in which his unemployment is due to willful misconduct connected with his work.

bargaining agreement, which provided in part that: (1) meter readers were to work eight-hour shifts without any breaks; (2) meter readers who finished a route in fewer than eight hours were required to work eight hours by performing other duties; and (3) meter readers were prohibited from conducting personal business on company time. Claimant was a member of the union and was aware of the terms of the collective bargaining agreement. (UCBR's Findings of Fact, Nos. 1–5.)

On September 23, 2003, Claimant was observed during his 8:00 a.m. to 4:00 p.m. work shift by Frank S. Passant, an investigator hired by Employer to conduct surveillance of its meter readers. Claimant concluded his assigned route at approximately 1:00 p.m.; he then went home, changed clothes, picked up his children at school, stopped at a pharmacy and returned home at approximately 3:30 p.m. Claimant did not contact Employer to request time off or to request additional assignments to fulfill his required eight hours of work. Claimant did not perform any work for Employer after 1:00 p.m., but he was paid as if he had worked a full eight-hour shift. (UCBR's Findings of Fact, Nos. 6–10.)

At an October 28, 2003, meeting with Robert Frankhouser, a human resources employee, and Raymond Miller, Claimant's supervisor, Claimant acknowledged that he was required to call his supervisor before taking time off to conduct personal business during the work day. By letter dated December 5, 2003, Employer informed Claimant that it was terminating Claimant's employment, effective December 6, 2003, because Claimant had conducted personal business on company time, had collected pay for hours he did not actually work and had knowingly made false statements to company officials during the course of an investigation of employee misconduct.[2] (UCBR's Findings of Fact, Nos. 11–12; Record item 3, exhibit 5.)

The local job center determined that Claimant was ineligible for compensation under section 402(e) of the Law, and Claimant appealed. At hearings before a referee, Claimant acknowledged that, after he finished his assigned work at about 1:00 p.m. on September 23rd, he went home, picked up his children, went to a pharmacy and then returned home. Claimant stated that he completed all the work assigned to him for that day, he believed that the assigned work was all he had to get done each day and no supervisor had ever told him differently. However, Claimant acknowledged that his supervisor constantly gave Claimant and other meter readers additional meters to read to make sure that they had eight hours of work each day. (Record item 10, N.T. at 28.)

Claimant further testified that when he met with Frankhouser and Miller on October 28, 2003, neither advised Claimant that there was any problem with his conduct. (Record item 8, N.T. at 25.) In fact, Employer stipulated that Claimant received a merit-based salary increase on or after his anniversary date of October 30, 2003.[3] (Record item 10, N.T. at 18.)

Employer presented the testimony of Passant, who described his surveillance of Claimant's activities on September 23,

2. According to notes of the October 28, 2003, meeting taken by Miller and Frankhouser, Claimant stated that he never submitted for hours that he did not work. (Record item 8, Claimant's exhibits 2 and 3.)

3. Pursuant to the parties' collective bargaining agreement, Employer is required to deter-

mine, within thirty days prior to an employee's anniversary date, whether the employee's performance has been satisfactory, and an employee whose performance is rated as satisfactory is entitled to receive a salary increase. (Record item 10, Employer's exhibit A.)

2003. Passant stated that he contacted Employer after Claimant returned home at 3:36 p.m., and Employer requested Passant to continue the surveillance of Claimant until 4:30 p.m. Passant testified that he met with Employer and provided the surveillance tapes of Claimant on September 24th, and he filed a formal report with Employer on October 17, 2003. (Record item 8, N.T. at 5–8.)

Miller also testified on Employer's behalf and described Employer's investigation procedures as follows. Employer hired a private investigating company to conduct surveillance on seventeen of eighteen meter readers.[4] The surveillance took place from August through the third week in October. Investigators observed each meter reader for at least two days, then furnished the surveillance tapes to and filed a formal report with Employer. Once Miller obtained the video tape and investigator's report, he reviewed the tape with his manager and compared the video tape to the "Itron" report[5] for the date in question; after that, Miller and his manager prepared a report and had a meeting with their immediate supervisor. Because other scheduled work needed to be done, review of the video tapes and the investigator's written reports took a day-and-a-half to two days for each meter reader. After review of the video tapes and reports was completed, Miller and Frankhouser held individual meetings with fifteen of the meter readers on October 28, 2003, and with the remaining two meter readers approximately a week later. (Record item 8, N.T. at 12–18.) After these meetings were completed, Miller and Frankhouser each compiled their notes, then met and prepared a report of the statements given by each meter reader. Thereafter, Miller and Frankhouser participated in five meetings with upper management, and the company completed its investigation in late November or early December. (Record Item 8, N.T. at 18–19.)

At the conclusion of the hearings, the referee found that Claimant was or should have been aware of the applicable work rules, admitted that he was away from work on September 23rd for personal reasons and was discharged for violating work rules. However, the referee reversed the job center's denial of benefits, concluding that Claimant's conduct on September 23rd was too remote in time from his discharge on December 6th to warrant a denial of benefits.

Employer appealed to the UCBR, which reversed the referee's decision and held that Claimant was ineligible for compensation under section 402(e) of the Law. The UCBR found that Employer's investigation of seventeen meter readers took several months, due to the number of employees under surveillance, the review of videotapes made by investigators, the interviews of employees and the decisions made to discharge a number of employees. (UCBR's Findings of Fact, Nos. 13–14.) Noting the breadth and thoroughness of Employer's investigation, the UCBR concluded that the delay between Employer's awareness of Claimant's misconduct and its ultimate action to discharge Claimant was reasonable, and, therefore, Claimant's misconduct was not too remote from Employer's termination of Claimant to be the basis for a denial of benefits under section 402(e).

■ On appeal to this court,[6] Claimant

---

4. Miller explained that one meter reader read meters by appointment only.

5. The "Itron" is a device used to record meter readings. (Record item 10, N.T. at 10.)

6. Our scope of review is limited to determining whether constitutional rights were violated, whether the adjudication is in accordance with the law or whether necessary findings of fact are supported by substantial evidence.

argues that the seventy-four day delay between Claimant's alleged misconduct and his discharge renders the misconduct too remote in time to warrant a denial of benefits under section 402(e) of the Law. Claimant notes that Employer was informed of the conduct leading to Claimant's discharge on September 23rd, was shown video tapes of Claimant's actions on September 24th and received a written report from its investigator on October 17th. Claimant also notes that Employer gave Claimant a satisfactory performance rating and a salary increase after his alleged misconduct.

Claimant relies on *Tundel v. Unemployment Compensation Board of Review,* 44 Pa.Cmwlth. 312, 404 A.2d 434 (1979), in which a claimant admitted to sleeping on the job on May 17, 1977, but was not fired until June 13, 1977, twenty-five days later. Reversing the UCBR's denial of benefits, the court stated:

> Considering the time span, it is unlikely that an employer would consider the specific incident to be of such grave consequence as to constitute willful misconduct. An incident of willful misconduct cannot be so temporally remote from the ultimate dismissal and still be the basis for a denial of benefits. *There being no explanation in the record for the delay,* we hold that, under these circumstances, the May 19 incident is too remote in time to support UCBR's conclusion that Tundel's discharge was caused by willful misconduct.

*Id.* at 436 (citations omitted) (emphasis added). Thus, the court concluded that an unexplained delay of twenty-five days indicated that the employer did not consider the incident to be willful misconduct and/or condoned the claimant's conduct.

Claimant also relies on our decision in *Panaro v. Unemployment Compensation Board of Review,* 51 Pa.Cmwlth. 19, 413 A.2d 772 (1980), wherein an employer discharged a claimant for allegedly recommending payments to contractors for work that had not been completed. The employer, however, could not establish when the alleged misconduct occurred. The court characterized the employer's testimony to be, at most, "speculation by the claimant's supervisor that the acts took place at a time between one month and two months prior to the discharge." *Id.* at 774. The court in *Panaro* held that the lack of evidence on this point was fatal to the employer's case and reversed the UCBR's determination that the claimant was ineligible for benefits. Citing its prior holding in *Tundel,* the court stated that where the alleged infraction occurred at a time too remote from the date of the claimant's discharge, the infraction cannot support a finding that the claimant was discharged for willful misconduct.

Claimant notes that the delay in this case exceeds the delays at issue in *Tundel* and *Panaro.* Claimant also observes that the facts here are distinguishable from cases such as *Bivins v. Unemployment Compensation Board of Review,* 79 Pa. Cmwlth. 643, 470 A.2d 662 (1984), and *Lower Gwynedd Township v. Unemployment Compensation Board of Review,* 44 Pa.Cmwlth. 646, 404 A.2d 770 (1979), in which the employer did not learn of the claimant's misconduct for a month or more, but acted expeditiously once it became aware of the claimant's actions. In *Bivins,* a teacher was suspended (and ultimately discharged) thirty-nine days after he struck a student. The court held that the remoteness doctrine was not applicable because the principal waited a month before bringing the incident to the attention of the school board, which then took immediate action. In *Lower Gwynedd Town-*

Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704.

*ship,* a police officer was discharged for conduct unbecoming an officer more than seven months after the misconduct occurred. The court noted that the chief of police and township did not learn of the incident for seven months, at which time they took prompt disciplinary action. The court in *Lower Gwynedd Township* concluded that the lapse of time in no way reflected that the claimant's conduct was condoned by his employer and held that the claimant was ineligible for compensation.

Employer contends that the remoteness doctrine is inapplicable in the present case as well, arguing that the reasons for the delay in this case are fully set forth in the record. Employer asserts that it was fully engaged in an investigation of employee misconduct throughout the seventy-four day period, noting that its investigation included: video surveillance of seventeen employees, which was carried out over a period of thirty-four work days; an additional one-to-two days per employee spent reviewing the video tapes; interviews of each employee; and meetings with upper management. Citing *Wideman v. Unemployment Compensation Board of Review,* 95 Pa.Cmwlth. 218, 505 A.2d 364 (1986), Employer argues that courts refuse to apply the remoteness doctrine where the employer has a plausible explanation for a delay between the claimant's misconduct and the employer's termination.

In *Wideman,* an employee was fired for tardiness, and roughly fifty days had elapsed between his last infraction and his termination. The claimant contended that the remoteness doctrine barred the employer from relying on tardiness as a cause for termination. However, the court in *Wideman* agreed with the UCBR that the remoteness doctrine did not apply because the claimant's supervisor had taken immediate action by recommending claimant's discharge, and "any delay was occasioned by the nature of the administrative review process." *Id.* at 367. The court in *Wideman* distinguished the facts from those in *Tundel,* where the employer delayed for no apparent reason.

Subsequently, in *Letterkenney Army Depot v. Unemployment Compensation Board of Review,* 167 Pa.Cmwlth. 423, 648 A.2d 358 (1994), despite a delay of fifty days between the employee's misconduct and the employer's issuance of a disciplinary letter, we held that the reasoning in *Tundel* was not applicable. The claimant in *Letterkenney* was found with illegal drugs at his workplace on May 17, 1993, and immediately entered a rehabilitation center, where he remained for seventeen days. In the interim, the employer sent the recovered substances to a state laboratory for testing, and on June 9, the lab reported that most were found to be controlled substances. After the claimant's release from rehabilitation, the employer allowed him to return to work, but in a different position, pending the employer's decision concerning disciplinary action. By letter dated July 6, 1993, the employer notified the claimant that it proposed to terminate him no earlier than thirty days from his receipt of that notice.

The UCBR determined that, because of the delayed discipline, the claimant was eligible for compensation, but this court reversed the UCBR's award, stating that cases such as this do not turn on length of time alone. We distinguished *Tundel,* where the employer failed to explain the delay and emphasized that in *Letterkenney,* there was no action on the part of the employer indicating that the employer condoned the claimant's conduct or led the claimant to believe that the employer condoned such conduct.

Most recently, in *Department of Transportation v. Unemployment Compensation Board of Review,* 755 A.2d 744 (Pa.

Cmwlth.2000), the claimant violated an agreement with his employer by patenting a product he developed during the course of his employment. Although the claimant's misconduct occurred in 1995, the employer did not learn of a problem with the patent until October 1998. The employer confirmed the claimant's misconduct only after completing a seven-month investigation in May 1999 and then promptly discharged him. Based on these facts, we reversed the UCBR's conclusion that the discharge was too remote in time from the claimant's actions to support a finding of willful misconduct.

As these cases illustrate, where there is an *unexplained* substantial delay between the claimant's misconduct and the employer's act to terminate the claimant, the remoteness doctrine will preclude an employer from seeking a denial of benefits based on allegations of willful misconduct. However, where the record establishes an explanation for the delay, such as the lengthy nature of the employer's administrative review process, and there is no action on the part of the employer indicating that it condoned the claimant's conduct, the remoteness doctrine does not apply to preclude a denial of benefits.

Here, there is no dispute that, from the time Employer learned of Claimant's activities on September 23, 2003, to Employer's discharge of Claimant on December 5, 2003, Employer was actively engaged in an investigation and administrative review process concerning employee misconduct. The actions taken by Employer throughout this period do not reflect that Employer condoned Claimant's conduct, notwithstanding the fact that Claimant was given a satisfactory performance rating and salary increase effective October 30, 2003. As previously indicated, Employer was required to determine an employee's performance rating within thirty days prior to his anniversary date; thus, Employer was required to make this determination with respect to Claimant on or before September 30, 2003, just a few days after the conduct at issue occurred, before the October 28th meeting with Claimant and weeks before Employer's review process was completed.

The facts of this case distinguish the present matter from *Tundel*, and we have previously held that the need for administrative review is a valid reason for delay. *Wideman*. Therefore, we conclude that the "remoteness doctrine" is not applicable to preclude a denial of benefits for willful misconduct.

Accordingly, we affirm.

### ORDER

AND NOW, this 22nd day of December, 2004, the order of the Unemployment Compensation Board of Review, dated June 8, 2004, is hereby affirmed.